[Cite as *State v. Kaaz*, 2017-Ohio-5669.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2016-05-010 |
| - vs - | : | O P I N I O N<br>7/3/2017 |
| | : | |
| GENE R. KAAZ, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case No. CRI 2015-5237

Richard W. Moyer, Clinton County Prosecuting Attorney, Lindsey M. Fleissner, 103 East Main Street, Wilmington, Ohio 45177, for plaintiff-appellee

Bryan R. Perkins, Michael K. Allen, 810 Sycamore Street, 5th Floor, Cincinnati, Ohio 45202, for defendant-appellant

**PIPER, J.**

{¶ 1} Defendant-appellant, Gene Kaaz, appeals his convictions and sentence in the Clinton County Court of Common Pleas for rape, sexual battery, unlawful sexual conduct with a minor, and importuning.

{¶ 2} The charges stem from allegations made by J.R., who alleged that when she was nine years old, Kaaz began to sexually abuse her via oral, anal, and vaginal intercourse. According to J.R., a majority of Kaaz's sexual abuse occurred on a chair in Kaaz's locked

garage.

{¶ 3} Kaaz was indicted on 14 counts of rape, sexual battery, unlawful sexual conduct with a minor, and importuning. After pleading not guilty to the charges, the matter proceeded to a four-day jury trial. The jury found Kaaz guilty on all charges. After merging some of the charges, the trial court sentenced Kaaz to consecutive sentences for an aggregate prison term of 30 years to life. Kaaz now appeals his convictions and sentence, raising the following assignments of error. As Kaaz's first and seventh assignments of error are interrelated, we will address them together.

### I. Sufficiency and Weight of the Evidence

{¶ 4} Assignment of Error No. 1:

{¶ 5} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AS HE WAS CONVICTED ON INSUFFICIENT EVIDENCE.

{¶ 6} Assignment of Error No. 7:

{¶ 7} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AS HIS CONVICTIONS WERE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.

{¶ 8} Kaaz argues in his first and seventh assignments of error that his convictions are against the manifest weight of the evidence and not supported by sufficient evidence.

{¶ 9} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. The "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 10} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 11} "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, these issues are primarily matters for the trier of fact to decide." *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*

{¶ 12} Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, a "determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 13} Kaaz was convicted of rape in violation of R.C. 2907.02(A)(1)(b), which essentially prohibits sexual conduct with a person who is less than 13 years of age. Kaaz was also convicted of sexual battery in violation of R.C. 2907.03(A)(5), which criminalizes sexual conduct when the "offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." Kaaz was also convicted of importuning in violation of R.C. 2907.07(B)(1), which provides that no "person

shall solicit another * * * to engage in sexual conduct with the offender, when the offender is eighteen years of age or older and four or more years older than the other person, and the other person is thirteen years of age or older but less than sixteen years of age * * *." Finally, Kaaz was also convicted of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), which provides, that no "person who is eighteen years of age or older shall engage in sexual conduct with another * * * when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard."

### A.  Trial Testimony

### 1.  Child Protection Unit Caseworker

{¶ 14}   After reviewing the record, we find that Kaaz's convictions are all supported by sufficient evidence and were not otherwise rendered against the manifest weight of the evidence.  During Kaaz's trial, the state presented testimony from several witnesses.  The first was an investigative caseworker with the Clinton County Department of Job and Family Services, Child Protection Unit.  The caseworker testified that he investigated an allegation that Kaaz was allowing children to smoke marijuana and drink alcohol, and providing them with such.  When Kaaz's wife admitted that there was marijuana in the home, the caseworker continued his investigation.  As part of the investigation, the caseworker interviewed J.R.

{¶ 15}   J.R. confirmed that she consumed alcohol and marijuana provided to her by Kaaz. J.R., who was confined in a detention center at the time of her interview, admitted that she had been drinking from a young age.  The caseworker learned that J.R. had been in trouble for unruliness and kicking a police car, and that she engaged in self-harm through cutting herself.  J.R. became more comfortable with the caseworker during their discussion, and ultimately shared that Kaaz had sexually abused her.  The caseworker scheduled a follow-up interview with J.R., and contacted police regarding the allegations.

**{¶ 16}** During the follow-up interview with the caseworker and his supervisor, J.R. provided additional information regarding the sexual abuse she suffered from Kaaz. J.R. told the caseworker that the sexual abuse, which included vaginal intercourse, occurred on the chair in Kaaz's garage. J.R. also told the caseworker and supervisor that Kaaz would sometimes "pull out and ejaculate on the chair" or ejaculate inside of her if she was menstruating at the time. The caseworker and his supervisor gave this information to police.

### 2. Child Protection Unit Supervisor

**{¶ 17}** The state next presented testimony from the caseworker's supervisor, who is the investigative supervisor of the Child Protection Unit. The supervisor testified that when she and the caseworker interviewed J.R., J.R. indicated that she suffered sexual abuse at the hands of Kaaz since the age of nine. The sexual abuse would occur in the garage, on Kaaz's bed, and in Kaaz's bathroom. The supervisor then testified that she and the caseworker reacted to J.R.'s statement by informing police, specific to the sexual abuse occurring on the chair in the garage, for investigatory purposes.

**{¶ 18}** The supervisor also testified that she interviewed Kaaz, and that he denied giving J.R. alcohol or marijuana, but did state that he had lain in bed with J.R. However, Kaaz told the supervisor that nothing sexual occurred between himself and J.R. and that J.R. was a troubled child. When the supervisor specifically advised Kaaz of the allegations J.R. made, Kaaz "advised that he didn't want to talk about that any longer." The supervisor testified that when she asked Kaaz if there would be any reason his and J.R.'s DNA would be found on the chair in the garage, "his eyes got bigger. He sat back further and advised that he no longer wanted to talk, he wanted an attorney."

### 3. Detective

**{¶ 19}** The state also presented testimony from a Wilmington Police Department detective who was contacted by the supervisor and caseworker regarding J.R.'s allegations

of sexual abuse against Kaaz. The detective testified that once he was given information about the chair in Kaaz's garage, he obtained a search warrant and seized the chair. The detective described the chair as "nasty," and "dirty." Together with his supervisor, the detective moved the chair to the police station's evidence room where it was later analyzed by a special agent of the Ohio Bureau of Criminal Investigations ("BCI"). The detective testified that after the special agent found the presence of seminal fluid and other stains on the chair, he secured another search warrant to obtain DNA samples from Kaaz and the victim, and that police collected the samples from both.

### 4. BCI Agent

{¶ 20} The state next presented testimony from the BCI agent who took DNA samples from the chair. The agent testified that he performed a forensic sweep on the chair, and that he employed a black light to determine if the chair contained saliva, urine, or semen. When the light indicated several stains, the agent cut the fabric on the chair and did a preliminary test on the stained areas, as well as the chair's inside cushion. The preliminary tests indicated that the stains on the chair and the cushion contained seminal fluid. The agent then sent the samples to the laboratory for DNA testing.

### 5. Forensic Scientists

{¶ 21} The state called multiple BCI forensic scientists, who testified about testing the samples. The scientists confirmed that the samples tested positive for semen, and that DNA found on the chair belonged to Kaaz and J.R.

### 6. Mayerson Forensic Interviewer

{¶ 22} The state then called a social worker and forensic interviewer who is employed at the Mayerson Center for Safe and Healthy Children. The interviewer testified that her role at the Center is to "assess if something has happened to a child or if they have witnessed significant violence. Then my role is to assess the need for medical care which includes like

physical medical care, but also mental health care." The interviewer testified that when she spoke to J.R., J.R. provided "a lot of detail" regarding Kaaz's sexual abuse. Based on the information regarding the sexual abuse, the interviewer determined that J.R. needed a medical consultation as well as ongoing mental health therapy.

### 7. J.R.'s Brother

{¶ 23} The state then began presenting evidence from J.R.'s family about Kaaz and his actions in the years leading up to the sexual abuse allegations. In this regard, J.R.'s brother was the first to testify. He disclosed that Kaaz allowed him to drink alcohol when he was as young as 12, and that he and Kaaz drank alcohol together on multiple occasions. J.R.'s brother also testified that Kaaz began giving him marijuana in seventh grade, and that Kaaz provided him marijuana on multiple occasions. According to J.R.'s brother, Kaaz drank heavily, and when drunk, he would make "dirty comments," be "more touchy," and act "perverted * * * he would talk about parts of a girl or a guy." Kaaz also showed nude photographs to J.R.'s brother.

{¶ 24} J.R.'s brother testified that he noticed that Kaaz was more "touchy feely" with J.R. than he was with the other siblings, and that Kaaz would lie with J.R. on the couch, on his bed, or go out to the garage with J.R. Kaaz would also massage J.R. while she was sitting on the couch, and J.R.'s brother saw Kaaz and J.R. in Kaaz's bed together. J.R.'s brother testified that he would find Kaaz and J.R. together in bed at least once a week, and that Kaaz and J.R. would spend hours at a time in the garage with the door closed and locked. Kaaz also told J.R.'s brother to "go away" when Kaaz wanted to spend time alone in the garage with J.R.

{¶ 25} J.R.'s brother testified that J.R. confided in him and their older sister that Kaaz had "sexual conduct" with her and that she felt that the conduct was inappropriate but did not know how to stop it. J.R. told her brother that the sexual abuse had started when she was

nine years old. J.R.'s brother testified his reaction to what J.R. told him was to be "scared and threatened," and thus he did not tell anyone until much later.

### 8. J.R.

{¶ 26} J.R. then testified about the sexual activity that had taken place over the last several years. J.R. testified that when she was younger, around eight or nine years old, she felt ill and lay in Kaaz's bed to be cared for. Kaaz gave her whiskey to drink and subsequently kissed her. Kaaz then put his penis in J.R.'s mouth and later put his mouth on her vagina. J.R. testified that she ran into the bathroom and vomited after Kaaz finished. When J.R. was ten years old, Kaaz was giving her beer, and by 11, he was giving her marijuana.

{¶ 27} J.R. testified that Kaaz's demeanor would change often, and that alcohol was often a part of her sexual abuse. Kaaz would ask J.R. to massage him, and then take her to the garage where he would engage in vaginal intercourse with her after giving her shots of alcohol to drink. J.R. also testified that Kaaz would engage in oral and anal sex with her. The sexual conduct would occur more than once a week, and Kaaz never went more than a month without engaging in sexual conduct with J.R. J.R. also confirmed her brother's testimony regarding his seeing Kaaz and her together in bed, and testified that before her brother came to the door, she and Kaaz had intercourse.

{¶ 28} J.R. also testified that when she would tell Kaaz not to touch her, he would tell her that he could make her feel better, that she acted out when she did not have "it," and that they could make each other feel good. Kaaz also told J.R. not to tell anyone about the sexual conduct or they would both get into trouble. However, J.R. did tell her sister and brother, just as her brother testified to earlier in the trial.

### 9. J.R.'s Older Sister

{¶ 29} J.R., who is the youngest of the four children, had two sisters. The older sister

testified that Kaaz began providing her alcohol when she was 11 or 12, and that she would get drunk on the alcohol Kaaz provided her. Kaaz also provide her marijuana, which they smoked together. J.R.'s sister also testified that Kaaz would talk to her about sexual intercourse, specifically as to what positions she should use with her partners. Kaaz also showed J.R.'s sister pictures of genitals and described what areas to touch for pleasure. Kaaz also demonstrated sexual positions with J.R.'s sister by grabbing her hips and showing her how to move on top of him.

{¶ 30} J.R.'s sister also testified that when she and Kaaz were talking about oral sex, Kaaz licked her bare leg on her inner thigh. Kaaz also kissed her on the lips while lying on the floor with her. He also kissed her on the back of her ear, moving down her neck and across the front of her upper chest. J.R.'s sister later testified that one night, she woke up and Kaaz was trying to put his hand up her shirt. J.R.'s sister confirmed during her testimony that J.R. told her and their brother about Kaaz's sexual abuse. J.R. also told her sister that she and Kaaz had sexual intercourse.

### 10. J.R.'s Other Sister

{¶ 31} The younger of J.R.'s sisters testified that Kaaz offered her alcohol and marijuana and pressured her into using marijuana with him. He also showed her images of nude women, which the sister found "disgusting." The sister also testified that she saw Kaaz and J.R. go to the garage together, "a couple times a week," and that the garage door was then shut and locked. Because of what occurred in the household, the sister testified that she would not go into the garage herself.

### 11. Kaaz

{¶ 32} Kaaz testified in his own defense, and denied any sexual conduct with J.R. On cross-examination, he denied every allegation J.R. and her siblings testified to, including providing marijuana for the children, touching any of them inappropriately, or having any

sexual contact with them. Kaaz indicated that the children's testimony was fabricated and that the children were "liars."

### 12. Kaaz's Son

{¶ 33} Kaaz's son from a previous relationship also testified in his defense. The son testified that he had never seen any sexual contact between Kaaz and J.R. However, Kaaz's son also testified that he no longer lived with Kaaz because Kaaz gave him alcohol and marijuana when he was in the fifth grade, and his mother then made him reside with her.

{¶ 34} After viewing this evidence in a light most favorable to the prosecution, we find that the state proved the elements of the crimes charged, and that the jury did not lose its way or create a manifest miscarriage of justice in finding Kaaz guilty. While Kaaz testified that he did not sexually abuse J.R., the jury was in the best position to judge his credibility, and we will not disturb its finding that Kaaz's credibility was lacking or that J.R. and the other states' witnesses were believable. As such, we overrule Kaaz's first and seventh assignments of error.

### II. Other Bad Acts

{¶ 35} Assignment of Error No. 2:

{¶ 36} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY ALLOWING THE PROSECUTION TO INTRODUCE EVIDENCE OF OTHER BAD ACTS SEPARATE FROM THOSE ALLEGED IN THE INDICTMENT.

{¶ 37} Kaaz argues in his second assignment of error that the trial court erred by admitting evidence of Kaaz's prior bad acts.

{¶ 38} A trial court's decision to admit or exclude relevant evidence will not be reversed absent an abuse of discretion. *State v. Bozeman*, 12th Dist. Butler No. CA2008-10-248, 2009-Ohio-3677. An abuse of discretion connotes more than an error in law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.

*State v. Jones*, 12th Dist. Butler No. CA2012-04-077, 2013-Ohio-654.

{¶ 39} Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit a crime, or that he acted in conformity with bad character. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472. However, there are certain exceptions that allow evidence of other acts of wrongdoing.

{¶ 40} First, R.C. 2945.59 provides,

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶ 41} Also, Evid.R. 404(B) provides that evidence of other crimes, wrongs, or acts is permitted to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, of the absence of mistake or accident. *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966.

### A. *State v. Williams*

{¶ 42} The Ohio Supreme Court laid out a three-part test to determine if other acts evidence is admissible. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695. First, the court is to "consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at ¶ 20. Second, the court is to consider "whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* Third, the court is to

consider "whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.*

### 1. Applicable Testimony

{¶ 43} During the trial, and as discussed in Kaaz's first and seventh assignments of error, J.R.'s siblings testified regarding sexually-related instances they witnessed or experienced involving Kaaz. The siblings testified about Kaaz showing them nude pictures, telling sexually-related jokes, discussing sex with them, demonstrating sexual positions, and receiving alcohol and marijuana from Kaaz. J.R.'s older sister also testified that Kaaz kissed her in an inappropriate manner and licked her thigh during a discussion of oral sex. Kaaz now claims that this testimony was impermissible prior bad acts testimony. However, the record indicates that the testimony was proper to show Kaaz' intent, motive, preparation, and plan.

{¶ 44} Specifically, the trial court permitted the testimony to show Kaaz's grooming of J.R., and how he went about plying the victim with alcohol and drugs to make his sexual abuse of her easier.[1] These acts – including discussing sex, showing nude pictures, kissing the siblings inappropriately, and reducing their inhibitions – demonstrated grooming behavior that was characteristic of Kaaz's intent, motive, preparation, and plan to sexually abuse J.R. Kaaz's actions were specific and repeated, and were indicative of his sexual behavior toward children.

### 2. *Williams* Test

{¶ 45} Regarding the test set out in *Williams*, we find that the trial court did not abuse its discretion in admitting the evidence. First, the other acts evidence was of consequence in the determination of what occurrences or facts were probable to exist. The testimony clearly

---

1. As noted by the *Williams* court, grooming "refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity." 2012-Ohio-5695 at ¶ 21.

established Kaaz's approach to preparing J.R. for the sexual abuse, and demonstrated that Kaaz normalized sexual behaviors with the siblings when they were young children. *See State v. Stanforth*, 12th Dist. Clermont No. CA2016-07-052, 2017-Ohio-4040 (affirming use of other acts testimony to demonstrate appellant's grooming of the victims). Kaaz took specific and repeated actions to groom and normalize sexual behavior, including showing the siblings nude pictures, discussing genitalia, instructing them on sexual positions and gratification, as well as intimate touching and kissing.

{¶ 46} Second, the testimony was presented to prove Kaaz's motive and intent, rather than his character to show activity in conformity therewith. Specifically, the testimony established Kaaz's routine of manipulating the siblings, and his repeated actions to lower their inhibitions through alcohol and marijuana. Kaaz also familiarized the siblings with sexual concepts at a young age by telling sexually-related jokes, suggesting to the siblings sexual activities to please themselves and their partners, and demonstrating sexual acts to and with the siblings. Moreover, in its final instructions to the jury, the trial court instructed the jury that it could not consider evidence of any other acts to show character and activity in conformity therewith. We presume the jury followed this instruction. *See State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966 (finding the second prong of the three-part *Williams* test fulfilled where the jury was given a similar limiting instruction regarding prior acts testimony).

{¶ 47} Third, the probative value of the other acts evidence was not substantially outweighed by the danger of unfair prejudice. The trial court noted that, in general, evidence of criminal activity is inherently prejudicial. However, the trial court concluded, and we agree, that the probative value outweighed any prejudice. The witnesses were subject to cross-examination, and defense counsel continuously challenged the witnesses and their credibility regarding their testimony of Kaaz's sexual motives and actions. Moreover, Kaaz testified in his own defense that the siblings were lying, and the jury was free to judge the credibility of

each witness it heard testify.

{¶ 48} After reviewing the record, we find that the testimony was properly admitted for the sole purpose of showing Kaaz's motive, preparation, and plan to target J.R. as a victim through the use of grooming. As such, we overrule Kaaz's second assignment of error.

### III. Prosecutorial Misconduct

{¶ 49} Assignment of Error No. 3:

{¶ 50} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AS HE WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT ALLOWED THE PROSECUTING ATTORNEY TO ENGAGE IN MISCONDUCT.

{¶ 51} Kaaz argues in his third assignment of error that the prosecutor engaged in misconduct during his trial.

{¶ 52} For a conviction to be reversed on the basis of prosecutorial misconduct, a defendant must prove the prosecutor's acts were improper and that they prejudicially affected the defendant's substantial rights. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 62. To demonstrate prejudice, a defendant must show that the improper remarks or questions were so prejudicial that the outcome of the trial would clearly have been otherwise had they not occurred. *State v. Jones*, 12th Dist. Butler No. CA2006-11-298, 2008-Ohio-865, ¶ 21.

{¶ 53} The focus of "an inquiry into allegations of prosecutorial misconduct is upon the fairness of the trial, not upon culpability of the prosecutor." *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 57. As such, prosecutorial misconduct "is not grounds for error unless the defendant has been denied a fair trial." *State v. Olvera-Guillen*, 12th Dist. Butler No. CA2007-05-118, 2008-Ohio-5416, ¶ 27.

{¶ 54} During Kaaz's cross-examination, the state questioned Kaaz about the allegations of sexual abuse. At one point, the prosecutor stated, "speaking of phone calls,

you advised your parents you'd take a plea deal in this case." Kaaz's counsel immediately objected, and the trial court sustained the objection. Kaaz did not answer or address the state's question at all. The transcript indicates that a side-bar was held, which was not transcribed in the record.[2] Even so, the transcript later indicates that the state and Kaaz's defense counsel discussed with the trial court whether the question would require a mistrial.

**{¶ 55}** The state indicated that the reason it sought to admit the conversation between Kaaz and his parents when he mentioned the plea deal was to provide context for Kaaz's later statement to his parents that he would "beat" the system and receive probation rather than a prison sentence. There were no actual plea negotiations between the state and Kaaz referenced in the prosecutor's question, and Kaaz was merely speaking to his parents about his plans to manipulate the justice system. The state's attempt to question Kaaz regarding his conversation with his parents was not made to indicate a failed attempt at plea negotiations, nor was it an attempt to indicate that Kaaz expressed any guilt.

**{¶ 56}** Although the state later indicated why it was posing the question and the issuewas cured by the defense's objection, the inference of Kaaz's willingness to plead – regardless of his reason for doing so – was not necessary to prove the charges facing Kaaz, and any gains hoped to be made by the state that Kaaz was attempting to avoid a prison sentence pale in comparison to the victim's testimony and corroborating DNA evidence.[3]

---

2. Multiple times throughout the transcript, counsel would join the trial court at the bench for a sidebar. However, none of the sidebar discussions were transcribed. Instead, the transcript would merely indicate that an "off-the-record discussion" was held, and then the trial court would announce a decision as a result of the sidebar. As a reviewing court that relies upon the record, the absence of such discussions diminishes our review. Neither the state nor defense counsel raised any objection to the sidebars not being part of the record, yet without such, we do not know what arguments or legal reasoning were specifically given by the respective parties. When a decision of the trial court is being attacked, or supported, it is important to have a record of the preceding discussions.

3. Kaaz's argument in this assignment of error clings to an assumed inference that the mention of a plea deal could mean Kaaz was guilty. However, Kaaz not accepting the plea deal could easily lead to an inference that Kaaz was not willing to plead to something he did not do. One could easily infer the state was offering a plea deal because the state considered its evidence lacking. Therefore, the prejudice Kaaz assumes may not even exist.

Simply stated, it was unnecessary for the state to venture into this territory, yet, it is clear Kaaz was not prejudiced to any extent that denied him a fair trial.

{¶ 57} Aware of the state's intent, this question did not rise to the level of prosecutorial misconduct. While a plea deal would rarely be admissible at trial, the prosecution had a good faith basis for attempting to ask the question. *State v. Gillard*, 40 Ohio St.3d 226, 231 (1988) ("a cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists"). Furthermore, the trial court specifically instructed the jury that statements made by the attorneys were not evidence and should not be considered as evidence. Given this instruction and the immediate sustaining of Kaaz's objection to the question, the jury would not have considered the prosecutor's question.

{¶ 58} Kaaz also claims prosecutorial misconduct because the state referred to him during its opening statement as a "pedophile" and a "predator." While Kaaz argues that this name-calling was perpetuated to damage his character and prejudice him in the eyes of the jury, we disagree. The context of the statements, as indicated in the trial transcript, indicate that the state was telling the jury what it believed the evidence would prove, specific to the charges against Kaaz. Specifically, the full statement was, "the evidence in this case will prove beyond a reasonable doubt that defendant is a predator and a pedophile and that over the course of the last seven years he has repeatedly sexually molested and raped" J.R.

{¶ 59} The terms "predator" and "pedophile" are descriptive labels that are inherently connected to sexual perpetrators and are arguably used to stigmatize those labeled as such. While the statement was perhaps inartful or needless, it did not rise to the level of prosecutorial misconduct where the statement was only made in one instance by the state, not repeatedly, and was specific to what the evidence was expected to show. The ultimate decision as to whether Kaaz was guilty or innocent of specific conduct was left to the jury,

and no other incidents indicate in the record that the state was attempting to stigmatize Kaaz unfairly.

{¶ 60} Nor is there any indication in the record that the two words used in opening statements prejudiced Kaaz or rendered his four-day trial unfair. This is especially true where there was overwhelming evidence of Kaaz's guilt, including testimony from the victim and DNA evidence that corroborated her testimony. As such, and having found no prosecutorial misconduct, we overrule Kaaz's third assignment of error.

**IV. Motion for Mistrial**

{¶ 61} Assignment of Error No. 4:

{¶ 62} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY FAILING TO GRANT HIS REQUEST FOR A MISTRIAL AFTER THE PROSECUTOR MADE A STATEMENT INDICATING THAT THE DEFENDANT-APPELLANT WAS WILLING TO TAKE A PLEA AGREEMENT.

{¶ 63} Kaaz argues in his fourth assignment of error that the trial court erred by not granting his motion for a mistrial after the state referenced Kaaz taking a plea deal with the state.

{¶ 64} A mistrial should not be ordered merely because of some error or irregularity at trial. *State v. Partin*, 12th Dist. Butler No. CA2012-09-189, 2013-Ohio-2858. Instead, "mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). A trial court's decision to deny a motion for a mistrial is within the sound discretion of the trial court. *State v. Gilbert*, 12th Dist. Butler No. CA2010-09-240, 2011-Ohio-4340, ¶ 83. "An appellate court will not disturb the exercise of this discretion absent a showing that the accused has suffered material prejudice." *State v. Blankenship*, 102 Ohio App.3d 534, 549 (12th Dist.1995).

{¶ 65} As previously discussed, the trial court denied Kaaz's request for a mistrial

after the prosecutor made reference to Kaaz's conversation with his parents in which he indicated his intent to strike a plea deal to "game" the justice system. However, and for the same reasons we found that the prosecutor did not engage in misconduct, we find that the trial court did not abuse its discretion in denying Kaaz's request for a mistrial.

{¶ 66} Again, we decline to accept Kaaz's invitation to assume prejudice occurred. The prosecutor's question did not reference anything in regard to actual plea negotiations. Nor did it necessarily imply Kaaz's guilt. The trial court immediately sustained defense counsel's objection and Kaaz did not answer or address the plea issue. The jury was properly instructed that attorney statements were not evidence, and we have no reason to believe the jury did not fully and faithfully follow the court's instructions.

{¶ 67} After reviewing the record, we find that the trial court did not abuse its discretion in denying Kaaz's motion for a mistrial, and we overrule his fourth assignment of error.

### V. Vouching for Credibility

{¶ 68} Assignment of Error No. 5:

{¶ 69} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY PERMITTING A SOCIAL WORKER TO VOUCH FOR THE CREDIBILITY OF AN ALLEGED VICTIM OF SEXUAL ABUSE.

{¶ 70} Kaaz argues in his fifth assignment of error that the trial court erred by permitting a witness to bolster the credibility of the victim.

{¶ 71} Generally, lay witnesses are prohibited from testifying as to another witness' veracity. *State v. Cappadonia*, 12th Dist. Warren No. CA2008-11-138, 2010-Ohio-494, ¶ 36. "[I]t is the fact-finder who bears the burden of assessing the credibility and veracity of witnesses." *Id.* at ¶ 17.

{¶ 72} Kaaz argues that the state used two witnesses to bolster the credibility of J.R.

Kaaz claims that the forensic interviewer from the Mayerson Clinic and the caseworker supervisor testified improperly as to J.R.'s credibility.

## A. Mayerson Center Forensic Interviewer

{¶ 73} Regarding the interviewer, the state asked her to describe J.R. "generally" when she was interviewed at the Center. The interviewer then answered

> Very engaging. I felt like she really gave thought to the questions that were being asked of her and her answers[,] and corrected herself if she misspoke. I felt like she was trying to be as comprehensive and informative as she could with me because she obviously knew why she was there and she wanted to be able – I felt like she wanted to be able to provide me with as much information as she could so that I could do my job.

This testimony did not address J.R.'s veracity, rather it addressed generally the impression the interviewer had during her time with J.R. in regard to the quality of the interview and how J.R. engaged with her during that time. Not one word in the interviewer's testimony relates to credibility, but rather, to J.R. as being comprehensive and informative. Moreover, the state asked for only a "general" description of J.R., and never asked the interviewer to relay her opinion as to J.R.'s credibility.

## B. Child Protection Unit Supervisor

{¶ 74} Kaaz also asserts that the state offered testimony from the caseworker supervisor in an effort to bolster J.R.'s credibility. During the supervisor's testimony, she discussed that she and her caseworker found J.R.'s statements regarding the chair in Kaaz's garage important, and that she reported that information to police specifically. The state then asked, "was the identification of that chair, in particular, important to you?" The supervisor responded, "well, I think once we found out that the chair did, in fact, exist, it showed us that [J.R.] was a credible witness."

{¶ 75} While this testimony did address J.R.'s credibility, the testimony was specific to the allegations she made against Kaaz to children services and how J.R.'s information was

relevant when determining whether allegations should be substantiated. As such, the supervisor's statements regarding J.R.'s credibility spoke directly to the supervisor's reaction when learning the police seized a chair from Kaaz's garage.

{¶ 76} The supervisor's ultimate decision to believe that physical evidence, in her opinion, corroborated J.R.'s statement regarding the existence of a chair was of a limited nature. Testifying to the fact that physical evidence exists to corroborate a victim's statement is not an unfair bolstering of the victim. The testimony was not offered in an attempt to make the jurors believe that J.R.'s testimony in its entirety was credible. This line of testimony was not used to supplant the jury's role and responsibility to assess J.R.'s credibility. We also note that the court instructed the jury that it alone determined a witness' credibility and what weight should be given, if any, to testimony.

{¶ 77} Having found that the state's witnesses were not used to bolster J.R.'s in-court credibility, we find that the trial court did not improperly admit testimony from these witnesses. Therefore, we overrule Kaaz's fifth assignment of error.

## VI. Hearsay

{¶ 78} Assignment of Error No. 6:

{¶ 79} THE TRIAL COURT ERRED OT [SIC] THE PREJUDICE OF DEFENDANT-APPELLANT BY ADMITTING NUMEROUS INSTANCES OF IMPERMISSIBLE HEARSAY EVIDENCE.

{¶ 80} Kaaz argues in his sixth assignment of error that the trial court impermissibly admitted hearsay evidence at his trial.

{¶ 81} As previously stated, the admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012 Ohio 4769, ¶ 25. Absent an abuse of discretion, an appellate court will not disturb a trial court's ruling as to the admissibility of evidence. *State v. Issa*, 93 Ohio St.3d 49, 64 (2001).

{¶ 82} According to Evid.R. 801(C), hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible unless it falls within one of the permissible hearsay exceptions. Evid.R. 802. However, where the evidence is offered to show the effect on the listener, rather than to prove the truth of the matter asserted, the out of court statement is nonhearsay. *State v. Kersbergen*, 12th Dist. Butler No. CA2014-10-218, 2015-Ohio-3103, ¶ 50.

### A. Child Protection Unit Caseworker and Supervisor

{¶ 83} Kaaz first argues that the trial court permitted impermissible hearsay testimony when the caseworker testified to what he and J.R. discussed. During the caseworker's testimony, he testified that J.R. told him that Kaaz sexually abused her since the age of nine, and that Kaaz engaged in vaginal intercourse with her on the chair in the garage. Thereafter, the casework supervisor testified that J.R. also told her that Kaaz engaged in vaginal intercourse with her on the chair in the garage. The witnesses also testified that J.R. told them that Kaaz would sometimes ejaculate on the chair.

{¶ 84} The testimony of these two witnesses was not hearsay because it was not offered to prove the truth of the matter asserted, but rather to show why the children services agency continued its investigation and why the agency workers went to police regarding the potential existence of a chair in Kaaz's garage. The state's questioning was meant to establish a timeline of events regarding how the children services agency received the allegation that Kaaz provided alcohol and marijuana to the children and how that ended in Kaaz's arrest for sexual abuse. However, such testimony was not offered to prove that Kaaz had, in fact, engaged in vaginal intercourse with J.R.

### B. J.R.'s Sisters

{¶ 85} Kaaz next argues that two of J.R.'s siblings offered hearsay testimony when

- 21 -

they testified about statements J.R. made to them regarding Kaaz's sexual conduct with her. However, and similar to the testimony discussed above, this testimony was offered to show the effect the statements had on the siblings, rather than to prove the truth of the matter asserted. In fact, the state's line of questioning for one sibling was specific to whether that sibling reported the abuse to anyone. The sibling described the way that J.R. acknowledged the sexual abuse, and the state immediately asked, "how did you react to it" and later asked why the sibling decided not to tell anyone about the abuse. The other sibling also testified that J.R. admitted the abuse, and then testified at length about how she felt upon the disclosure and what she did and did not do as a reaction to what her sister told her. The siblings' testimony was offered to show the effect of J.R.'s statement upon them, not to prove that Kaaz sexually abused J.R.

{¶ 86} Even if the statements of J.R.'s siblings were to be considered hearsay as Kaaz suggests, those statements would only qualify as hearsay statements because one of J.R.'s siblings testified prior to J.R.'s testimony. Pursuant to Evid.R. 801(D)(1)(b), J.R.'s siblings could have testified as to J.R.'s out-of-court statements as nonhearsay if offered *after* J.R. had testified and had been challenged on cross-examination. Therefore, the testimony from J.R.'s siblings as to her prior out-of-court statements would be harmless error given that the testimony was admissible after J.R. testified.[4]

{¶ 87} J.R. testified as to what she told her siblings and was subject to staunch cross-examination. From the beginning of the trial, to the end, the defense strategy was that J.R. was not telling the truth regarding the claimed sexual activity taking place between her and Kaaz. J.R.'s testimony revealed that her out-of-court statements made to her siblings were

---

4. Evid.R. 801(D) provides, "a statement is not hearsay if the declarant testifies at trial * * * and is subject to cross-examination concerning the statement and the statement is * * * consistent with the declarant's testimony and was given under oath subject to cross-examination * * * and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."

completely consistent with her statements made in court. We have previously acknowledged the admissibility of out-of-court statements made to an individual by a child-declarant who subsequently is in court and available for cross-examination. *State v. Hamilton*, 77 Ohio App.3d 293, 303 (12th Dist.1991). While not every out-of-court statement that the child-declarant made would necessarily be admissible, we have indicated previously the victim's specific statements pertaining to the acts of abuse would be admissible. *Id.* at 303. If a victim testifies, as J.R. did here, subsequent testimony by others to demonstrate her consistency is not hearsay if offered to rebut an express or implied charge that the victim-witness was not being truthful in his or her accusations.

{¶ 88} After reviewing the record, we find that the testimony presented from all witnesses was properly admitted, and that none was inadmissible hearsay. As such, Kaaz's sixth assignment of error is overruled.

### VII. Consecutive Sentences

{¶ 89} Assignment of Error No. 8:

{¶ 90} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY IMPOSING CONSECUTIVE SENTENCES.

{¶ 91} Kaaz argues in his eighth assignment of error that the trial court erred in imposing consecutive sentences.

{¶ 92} We review the imposed sentence under the standard of review set forth in R.C. 2953.08(G)(2), which governs all felony sentences. *State v. Marcum*, 146 Ohio St. 3d 516, 2016-Ohio-1002, ¶ 1. Pursuant to that statute, an appellate court does not review the sentencing court's decision for an abuse of discretion. *Marcum* at ¶ 10. Rather, R.C. 2953.08(G)(2) compels an appellate court to modify or vacate a sentence only if the appellate court finds by clear and convincing evidence that "the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law."

*Marcum* at ¶ 1.

**{¶ 93}** A sentence is not clearly and convincingly contrary to law where trial court "considers the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes postrelease control, and sentences the defendant within the permissible statutory range." *State v. Julious*, 12th Dist. Butler CA2015-12-224, 2016-Ohio-4822, ¶ 8. Thus, this court may "increase, reduce, or otherwise modify a sentence only when it clearly and convincingly finds that the sentence is (1) contrary to law or (2) unsupported by the record." *State v. Brandenburg*, 146 Ohio St.3d 221, 2016-Ohio-2970, ¶ 1.

**{¶ 94}** A consecutive sentence is contrary to law where the trial court fails to make the consecutive sentencing findings as required by R.C. 2929.14(C)(4). *State v. Marshall*, 12th Dist. Warren No. CA2013-05-042, 2013-Ohio-5092, ¶ 8. Pursuant to R.C. 2929.14(C)(4), a trial court must engage in a three-step analysis and make certain findings before imposing consecutive sentences. *State v. Smith*, 12th Dist. Clermont No. CA2014-07-054, 2015-Ohio-1093, ¶ 7. Specifically, the trial court must find that (1) the consecutive sentence is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

{¶ 95} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry." *State v. Bonnell*, 140 Ohio St. 3d 209, 2014-Ohio-3177, ¶ 37. While the trial court is not required to give reasons explaining these findings, it must be clear from the record that the court engaged in the required sentencing analysis and made the requisite findings. *Smith* at ¶ 8.

{¶ 96} After reviewing the record, we find that the trial court's sentence was not contrary to law and was fully supported by the record. The trial court made the requisite findings regarding consecutive sentences during the sentence hearing, and in its sentencing entry. The trial court also reiterated that the abuse began when J.R. was only nine years old, and that it happened repeatedly for years. The record demonstrates that the sexual conduct included vaginal and anal intercourse, as well as oral sex, kissing, and touching. This conduct began when the child was nine and continued to occur multiple times a week, never going longer than a month without repeated violations of the child.

{¶ 97} After a full review of the record, we find that the trial court's sentence was not contrary to law and was otherwise fully supported by the record. As such, Kaaz's eighth assignment of error is overruled.

## VIII. Cumulative Error

{¶ 98} Assignment of Error No. 9:

{¶ 99} THE CUMULATIVE EFFECT OF THE TRIAL COURT'S ERRORS LED TO A WRONGFUL VERDICT IN VIOLATION OF DEFENDANT-APPELLANT'S CONSTITUTIONAL RIGHTS OF DUE PROCESS.

{¶ 100} Kaaz argues in his final assignment of error that the cumulative effect of

errors made at his trial resulted in an invalid verdict.

{¶ 101} According to the cumulative error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. McClurkin*, 12th Dist. Butler No. CA2007-03-071, 2010-Ohio-1938, ¶ 105.

{¶ 102} "'There can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.'" *State v. Hill*, 75 Ohio St.3d 195, 212 (1996), quoting *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1980 (1983). The accused is to be given a fair trial, not a perfect trial. *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357 (1974).

{¶ 103} After finding no errors had occurred during Kaaz's trial, we find that he was not deprived of a fair trial, and the cumulative error doctrine is inapplicable. Kaaz's ninth and final assignment of error is, therefore, overruled.

{¶ 104} Judgment affirmed.

S. POWELL, P.J., concurs.

M. POWELL, J., concurs separately.

**M. POWELL, J., concurring separately.**

{¶ 105} I concur with the majority opinion but write separately to express my concerns regarding the admission, as nonhearsay, of J.R.'s statements to her siblings about appellant sexually abusing her.

{¶ 106} The record reflects that appellant had previously objected to the testimony of the social workers as to what J.R. had told them on the ground the statements were hearsay.

When J.R.'s siblings testified about what J.R. had told them, the trial court merely confirmed that defense counsel's objection was part of a continuing objection and overruled it. If there were any discussions between the trial court and defense counsel concerning this testimony and the objections to it, such discussions are not reflected in the record.

{¶ 107} The sole basis upon which the state relies on appeal in arguing that J.R.'s statements to her siblings about the sexual abuse were properly admitted is that the statements were offered not to prove the truth of the matter asserted in the statements, but rather, "to show the effect of the statement on the listener * * * and how they reacted."[5] Although the state does not specify how the statements affected J.R.'s siblings or how the siblings reacted to the statements, the state references to the pages of the transcript where J.R.'s siblings variously testified that what J.R. told them made them mad, upset, or cry, and that they didn't know what to do about it, felt responsible, and encouraged J.R. to tell someone. However, the relevance of the effect that J.R.'s disclosures had on her siblings and how they reacted to it is not apparent.

{¶ 108} I recognize that in defining "hearsay" Evid.R. 801(C) does not impose any explicit requirement that the purpose for which a statement is offered be relevant to any material trial issue. Relevance is a separate issue addressed in Article IV of the Ohio Rules of Evidence, and there was no objection based upon relevance. However, as a practical matter, offering the statements for irrelevant purposes belies the state's claim that the statements were not being offered to prove the truth of the matter asserted. There is no indication in the record that the trial court gave any consideration to the relevance of the effect J.R.'s statements had upon her siblings and how they reacted to them when it determined whether the statements were hearsay.

---

5. Because the state advances this single justification for the admission of J.R.'s statements to her siblings as non-hearsay, this concurring opinion will not address any alternative basis for admission which may be supported by the record.

**{¶ 109}** In my view, J.R.'s statements to her siblings about the sexual abuse should not have been admitted as non-hearsay statements because they were offered to show how they affected J.R.'s siblings and how the siblings reacted to the statements. Nonetheless, I concur in the affirmance of appellant's convictions because J.R. testified and was thus subject to cross-examination as to the substance of her statements to her siblings, and J.R.'s testimony, in conjunction with other evidence, supports the verdicts. Therefore, any error in the admission of the statements for the reason advanced by the state is harmless error.